UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Case No. 08-46367 |
| ARC Venture Holding, Inc., et al., | |
| Debtors.[1] | (Jointly Administered) |

**OBJECTION TO TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENT WITH FLEET LENDERS**

Debtors, by their undersigned counsel, hereby object to the Chapter 7 Trustee's Motion for an Order Approving Settlement with Fleet Lenders.[2] Dkt. No. 899. The hearing on this matter will be held on December 9, 2009 at 1:00 p.m. before the Honorable Nancy C. Dreher, Chief United States Bankruptcy Judge, in Courtroom 7W, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55402.

Debtors' object to the proffered Compromise on the basis of: (1) the prior stipulations with the Fleet Lenders; and (2) the absence of an accounting explaining the reasonableness of the claim allocation, payments from the escrowed funds, and provision of claims for the Fleet Lenders in excess of the escrow.

## I. FACTS

---

[1] Jointly administered estates of the following Debtors: ARC Venture Holding, Inc., Case No. BKY 08-46367; Southwest-Tex Leasing Co., Inc., Case No. BKY 08-46368; ARC of Texas, Inc., Case No. BKY 08-46369; Coast Leasing Corp., Case No. BKY 08-463670; Floral Leasing Corp., Case No. BKY 08-46371; Iliad Leasing Corp., Case No. BKY 08-46372; Miso Leasing Corp., Case No. BKY 08-46373; Nugget Leasing Corp., Case No. BKY 08-46374; Okra Leasing Corp., Case No. BKY 08-46375; Rainier Leasing Corp., Case No. BKY 08-46376; San Antonio Rental & Leasing Co., Inc. Case No. BKY 08-46377; Steamboat Springs Rental and Leasing Co., Inc., Case No. BKY 08-46379; Sun Leasing Corporation, Case No. BKY 08-46380; Tradewinds U-Drive, Inc., Case No. BKY 08-46383; Ute Leasing Corporation, Case. No. BKY 08-46384; ARC Licensing LLC Case No. 09-40394.

[2] Defined for purposes of this Objection as Hyundai Motor Finance Company ("Hyundai"), U.S. Bank N.A. ("US Bank"), and GE Leasing Company ("GELCO").

1

**A. Background**

Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Minnesota (the "Court") on December 8, 2008 ("the Petition Date"). An additional affiliate of Debtors, Advantage Licensing LLC, filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on January 24, 2009 ("the Second Petition Date"). Debtors operated their businesses and managed their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code until a sale of substantially all of the assets to Hertz Corporation acting through its subsidiary Simply Wheelz, LLC ("Buyer") was consummated on April 8, 2009 (the "§363 Sale"). Dkt. No. 561. The cases were converted to Chapter 7 on June 3, 2009. *See* Dkt. No. 658 and 717. Subsequently, Brian F. Leonard was appointed as Chapter 7 Trustee. *See* Dkt. No. 719 and 728.

**B.     Debtors' Operational Vehicle Leasing Structure**

Debtors leased vehicles from Rosedale Dodge, Inc. d/b/a Rosedale Leasing ("RDI"), Walden Fleet Services II LLC ("Walden"), and Rosedale Fleet Leasing II LLC ("RFL") (collectively "Rosedale Leasing") prior to the entry of the Court's Order approving their rejection.[3] Rosedale Leasing procured these vehicles for lease to the Debtors by virtue of separate leases with the Fleet Lenders.

Rosedale Leasing obtained the vehicles from US Bank pursuant to a Motor Vehicle Lease Agreement dated December 11, 2006 (the "U.S. Bank Lease Agreement"), and multiple Vehicle Lease Orders executed in connection with the U.S. Bank Lease Agreement (the "VLO's" and, together with the U.S. Bank Lease Agreement, collectively, the "U.S. Bank Leases").[4]

---

[3]  Dkt. No. 465, ¶ 11.

[4]  Dkt. No. 465, ¶ 22.

Ostensibly, the US Bank Leases provided for U.S. Bank to advance funds to Walden to finance its lease of the vehicles to Debtors under a Wholesale Lease Line and Security Agreement dated as of July 21, 2006.

Rosedale Leasing leased two classes of vehicles from HCA which were comprised of the "program" and "risk" vehicles.[5] Rosedale Leasing obtained these vehicles by virtue of secured loans on February 4, 2008 and August 11, 2008, in the aggregate original principal amount of $104,785,342.74.[6] In both instances, RDI used the funds provided by Hyundai Finance to refinance its purchase of approximately 4,477 motor vehicles (the "Hyundai Vehicles"), which RDI was then leasing, or may have later leased, to Debtors pursuant to lease agreements (the "Hyundai Leases").[7]

Finally, the vehicles provided to Debtors by Rosedale Leasing from GELCO were obtained pursuant to a Master Lease Agreement (the "GELCO Leases") with SW-Tex, RDI and RFL on January 12, 2007. Pursuant to the GELCO Leases, GE Fleet leases to SW-Tex, RDI and RFL, certain vehicles owned by GE Fleet and described and defined in the GE Fleet Lease (the "GELCO Leases").

**C.     Classification of Vehicles and Related Claims at Rejection.**

All of the above Vehicle Leases were rejected on April 15, 2009. Dkt. No. 496. At the time of rejection, the vehicles fell into the following six categories:

---

[5]   Program cars were approximately 30% of the Leased Vehicles which were included in a car manufacturer program that allowed the vehicles to be returned at specified manufacturer ramps at guaranteed prices. In order to return a Program Vehicle, Debtor had to repair the vehicle to meet certain mechanical and superficial requirements. A Program Vehicle not meeting said requirements would have been rejected.

[6]   Dkt. No. 465, ¶ 25.

[7]   Dkt No. 465, ¶ 25.

3.

a. <u>Rental</u> – The class of vehicles that were rented out by Debtors to its customers (the "Rental Vehicles") up until the point the Sale consummated on April 8, 2009.[8]

b. "<u>Do Not Repair</u>" – The class of vehicles that were designated as "Do Not Repair" by Debtors ("DNR Vehicles"). These vehicles were held by various automotive mechanics ("Mechanics") and automotive auction houses ("Auctions"). Fleet Lenders held the titles to these vehicles while Debtors pursued the insurance proceeds or other financial remuneration.[9]

c. <u>Hostage</u> – The class of vehicles that were being held by the Mechanics which were in various states of repair. These vehicles were subject to the provisions of the Court's Order establishing Turnover Procedures that was entered on February 12, 2009.[10] A vast majority of these vehicles were held by a company called Manheim.

d. <u>Repair</u> – The class of vehicles that were in need of repair as a result of post-petition usage. Repairs on the vehicles ceased on February 16, 2009 as a result of Debtors having little to no money to initiate or complete the work on the Repair Vehicles.

e. <u>Lost or Stolen</u> – The class of vehicles that were stolen, converted or never returned by the Debtors' customers, or were simply missing. Debtors' estimated that there were approximately sixty-two of the Fleet Lenders vehicles in this class as of April 3, 2009.[11]

f. <u>Sold</u> – Finally, the class of vehicles that Debtors sold, either by virtue of the Mechanics or the Auctions, but for which the title to the cars was not provided to the Mechanics or Auctions (the "Sold Vehicles"). The Sold Vehicles have, generally, suffered extensive damage and, as a result, have been designated by the Debtors as "DNR" or "Do Not Repair."

A vehicle falling into any of the above categories except for Rental also probably gave rise to a claim for monetary recovery. This recovery may have arisen from insurance through (1) the customer's insurance policies (all claims of any Debtor associated with any DNR, Hostage,

---

[8] Dkt. No. 465, ¶ 30(a).

[9] Dkt. No. 465, ¶ 30(b).

[10] Dkt. No. 232.

[11] Dkt. No. 465, ¶ 30(e).

4.

Repair, or Lost or Stolen Vehicle, whether against customers, insurance companies or any other persons or entities are collectively referred to herein as the "Vehicle Claims"); or (2) the applicable insurance coverage provided by the individual renters' credit card used to pay for the specific rental.[12] Debtors relied upon the services of Viking Collection Service, Inc. ("Viking") under a contract dated September 16, 2008 (the "Viking Agreement") to pursue the recovery of these funds. Previously, Debtors would forward certain documentation to Viking such as parts invoices, labor invoices, estimates, or other documentation in order to submit these claims on behalf of debtor to the various insurance companies.[13] In turn, Viking would recover the funds from the insurance companies and retain a commission of 12% for its efforts.[14] At the time of rejection, a number of claims related to the Vehicles remained outstanding and unliquidated.

**D.      Cash Collateral Stipulations with Fleet Lenders**

At the time of the filing and throughout the case, Debtors had little or no money with which to operate or pay the lease or adequate protection payments to the Fleet Lenders. Thus, Debtors were confronted with the unusual dilemma of (i) having little or no money to pay any adequate protection either during the first 60 days or anytime thereafter; (ii) having very little, if any, money to pay any lease amounts after the first 60-day period; (iii) the absolute necessity to keep the automobiles in order to bring this matter to proper sale; and (iv) depreciation rates which were extremely high based on the type of collateral and their use during the applicable period.

The company was hanging by a thread. As a result, effectively asked the Fleet Lenders for a "DIP loan" by virtue of consenting to not immediately retrieve the vehicles. At the time,

---

[12] Dkt. No. 365, ¶ 32

[13] Dkt. No. 684, ¶ 5, Dkt. No. 587, Ex. 1, ¶ E(3)

[14] Dkt. No. 684, ¶ 5, Dkt. No. 587, Ex. 1, ¶ E(3)

Debtors had no official prospect of sale, no letter of intent, and the sales negotiations did not appear to generate the possibility of satisfaction. Despite this, Debtors and Fleet Lenders were able to reach an accord in which the vehicles were left in operations without the immediate threat of retrieval.

As a result of this unique context, Debtors and the Fleet Lenders entered into two Stipulations for Adequate Protection. The First Stipulation was executed on or about January 29, 2009 by the Debtors and the Fleet Lenders.[15] Paragraph 4(a) of the First Stipulation recites the adequate protection payments and says, in relevant part:

> On or before February 9, 2009, the Debtors shall pay the Fleet Lenders as follows: $198,223.80 to U.S. Bank; $675,488.45 to Hyundai Finance (which will be applied to both Risk and non-Risk Vehicles); $85,612.80 to GE Fleet; and $40,674.96 to Carlton Financial (the "First February Lease Payment"). On or before February 27, 2009, the Debtors shall pay the Fleet Lenders the full lease payment…

Paragraph 4(d) of the First Stipulation grants the Fleet Lenders liens for any unpaid post-petition monetary obligations. Specifically, paragraph 4(d) said, in relevant part:

> Subject to subparagraph (f) hereof, Fleet Lenders shall be entitled to an administrative expense claim for all unpaid post-petition lease payments or other monetary obligations under the respective Leases, including, but not limited to, repair claims and indemnity claims incurred from the petition date through February 28, 2009. As security for the payment of the February Lease Payment, the 60-day Obligations and the Hyundai Risk Vehicle Payments for February, the Debtors hereby grant the Fleet Lenders valid, enforceable, and perfected liens and security interests…upon all property of the Debtors' estates as defined in Section 541 of the Bankruptcy Code (other than causes of action pursuant to Chapter 5 of the Bankruptcy Code)…

Debtors did not pay the entire amount due for February under 4(a). As a result, the Fleet Lenders were entitled to a lien for the unpaid amounts that remained subject to the Committee's objection.

---

[15] Dkt. No. 185

However, Debtors' failure to pay the February Lease payment was not terminal. In fact, the Fleet Lenders waived their right to immediate payment in the Second Stipulation.[16] The Second Stipulation served to extend the First Stipulation.. In fact, Paragraph 3 of the Second Stipulation continues all of the terms of the First Stipulation, except as listed in 3(a)-(c), which states:[17]

> (a) The Debtors will undertake their best efforts to pay all unpaid portions of the February Lease Payments to the Fleet Lenders.
> (b) [creates a fee carve-out]
> (c) The Debtors will make the March Lease payments owed to the Fleet Lenders as cash flow allows.

Thus, the primary distinction of the Second Stipulation was that the Fleet Lenders essentially agreed to be paid only as cash flow permitted. This seemingly one-sided agreement only makes sense in light of the fact that the §363 Sale was but a few weeks away and that the Fleet Lenders were expecting to be made whole from the sale proceeds.

## II. ARGUMENT AND AUTHORITY

### A. The Cash Collateral Stipulations Precludes a Blanket Approval of the Trustee's Proffered Compromise Without Further Accounting.

The Fleet Lenders Stipulations preclude the proposed compromise from meeting the necessary threshold for approval by the Court absent further accounting or explanation demonstrating its reasonableness. In relevant part, Rule 9019 of the Federal Rules of Bankruptcy Procedure provides:

> On motion by the trustee and after notice and hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States Trustee, the debtor and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

---

[16] Dkt. No. 336

[17] Dkt. No. 336

7.

The decision to approve or disapprove the proposed settlement under Bankruptcy Rule 9019 is within the Court's discretion.[18] In exercising this discretion, a court should consider the following factors:[19]

1. The probability of success in the litigation;
2. The difficulties, if any, to be encountered in the matter of collection;
3. The complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending to it; [and]
4. The paramount interests of the creditors and a proper deference to their reasonable views in the premises.
5. Whether the conclusion of the litigation promotes the integrity of the judicial system[20]

After consideration of these factors, a court can also determine whether a settlement is "fair and equitable"[21] in the best interest of the estate.[22] Although the court's function under Rule 9019 is not to ensure that the proposal is the best possible, it must determine that the settlement does not fall below the acceptable range.[23]

The Fleet Lenders previously agreed by virtue of the cash collateral stipulations and the Court's order approving the § 363 Sale that they were entitled to the segregated funds in the escrow account. The amount of funds to be put in the escrow account was based upon a per car calculation that was set forth in the binding Stipulations with the Fleet Lenders. As noted above

---

[18] *In re Trism, Inc.*, 282 B.R. 662 and 666 (B.A.P. 8th Cir. 2002); *In re Flight Transportation Corporate Securities Litigation*, 730 F.2d 1128, 1135-36 (8th Cir. 1984)); *In re Bates*, 211 B.R. 338, 343 (Bankr. D. Minn. 1997).

[19] *In re Flight Transportation Corporate Securities Litigation*, 730 F.2d at 1135-36; *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-425 (1968). *In re Bates*, 211 B.R. at 343; *see also In re Farmland Industries, Inc.*, 289 B.R. 122 (B.A.P. 8th Cir. 2003).

[20] Interpreted to mean that the compromise should further the goals of bankruptcy – fairness, finality, integrity and maximization of assets. *In re Bates,* 211 B.R. at 343; *In re Farmland Industries, Inc.*, 289 B.R. 122 (BAP 8th Cir. 2003).

[21] *Anderson*, 390 U.S. at 424.

[22] *In re Trisim, Inc.*, 282 B.R. at 668.

[23] *In re Hanson Industries, Inc.*, 88 B.R. 942, 945 (Bankr. D. Minn. 1988); *see also In re Teltronics Services*, 762 F.2d 185, 189 (2d Cir. 1985).

in further detail, the adequate protection payment was derived by the parties as a compromise of a per car allocation in light of the particular facts and circumstances of the Leases. Accordingly, to the extent the compromise provides for an aggregate claim in excess of the stipulation, it is unreasonable and detrimental to the estates unless further documentation and accounting is provided.

**B.    The Compromise Appears to Not Account for the Potential Direct Recovery of the Fleet Lenders Arising from Insurance Claims or Agreements.**

As noted above in further detail, the vehicles were in varying states of repair and disrepair at the time of their return to the applicable Fleet Lender. Although there were countless derivations of the vehicles status, the possibility of potential recovery of the vehicle damages or losses from the various insurance options remained. The proffered compromise fails to provide an accounting or mechanism of any funds already received or future receipts of insurance funds that will be or could be received directly by the Fleet Lenders from Viking or the various insurance companies. Accordingly, the absence of this provision for the potential recovery of funds by the Fleet Lenders in satisfaction and in lieu of the Lease claims, dictates that the proposed Compromise should not be approved by the Court pursuant to Rule 9019 unless further justification or explanation is provided.

### III.    CONCLUSION

For the foregoing reasons, Debtors request that the Court deny the Chapter 7 Trustee's Motion for Order Approving Settlement with Fleet Lenders to the extent it provides for any claims of the Fleet Lenders over the escrowed $10,000,000.00 until such time as an accounting is provided demonstrating the reasonableness of the settlement. Debtors anticipate that it will be necessary to hold an evidentiary hearing for purposes of establishing the factual basis of the compromise necessary to meet FRBP 9019. Further, Debtors reserve their right to object to any

provided accounting and the reasonableness of said calculations offered in support of the compromise until further evaluation of its propriety can be determined.

Respectfully submitted,

Dated: December 4, 2009  /e/ *Kenneth Corey-Edstrom*
Kenneth Corey-Edstrom (148696)
L. Kathleen Harrell-Latham (0388782)
Larkin Hoffman Daly & Lindgren Ltd.
1500 Wells Fargo Plaza
7900 Xerxes Avenue South
Minneapolis, Minnesota 55431-1194
kcoreyedstrom@lhdl.com
(952) 835-3800
Attorneys for Debtor

1283340.2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

ARC Venture Holding, Inc., et. al.,

Debtors[24].

Case No. 08-46367
(Jointly Administered)

**CERTIFICATE OF SERVICE**

I, Kenneth Corey-Edstrom, under penalty of perjury, hereby declares that on December 4, 2009, in connection with the above-referenced matter, the following document:

1. Objection to Trustee's Motion for Order Approving Settlement with Fleet Lenders;

2. Certificate of Service.

was filed with the Clerk of Court via **ECF**, and **ECF** will send a notice of electronic filing to all of the parties requesting electronic notice.

Dated: December 4, 2009
/e/ *Kenneth Corey-Edstrom*
Kenneth Corey-Edstrom (148696)
Larkin Hoffman Daly & Lindgren Ltd.
Attorneys for Debtor
1500 Wells Fargo Plaza
7900 Xerxes Avenue South
Minneapolis, Minnesota 55431-1194
kcoreyedstrom@lhdl.com
(952) 835-3800

---

[24] Jointly administered estates of the following Debtors: ARC Venture Holding, Inc., Case No. BKY 08-46367; Southwest-Tex Leasing Co., Inc., d/b/a/ Advantage, Case No. BKY 08-46368; Advantage Rent-A-Car, Inc., Case No. BKY 08-46369; Coast Leasing Corp., Case No. BKY 08-463670; Floral Leasing Corp., Case No. BKY 08-46371; Iliad Leasing Corp., Case No. BKY 08-46372; Miso Leasing Corp., Case No. BKY 08-46373; Nugget Leasing Corp., Case No. Bky 08-46374; Okra Leasing Corp., Case No. BKY 08-46375; Rainier Leasing Corp., Case No. BKY 08-46376; San Antonio Rental & Leasing Co., Inc. Case No. BKY 08-46377; Steamboat Springs Rental and Leasing Co., Inc., Case No. BKY 08-46379; Sun Leasing Corporation, Case No. BKY 08-46380; Tradewinds U-Drive, Inc., Case No. BKY 08-46383; Ute Leasing Corporation, Case. No. BKY 08-46384; Advantage Licensing LLC Case No. 09-40394.