UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

ARC VENTURE HOLDING,
INC., ET AL.,

                  Debtors.[1]

BKY 08-46367
Chapter 7
(Jointly Administered)

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER DENYING MOTION FOR ORDER APPROVING SETTLEMENT RE: LIVINGSTONE PARTNERS, LLC**

At Minneapolis, Minnesota, September 7, 2010.

The above-entitled matter came on for an evidentiary hearing before the undersigned on September 1, 2010, on the joint motion of Brian F. Leonard, the Chapter 7 Trustee ("Trustee"); Hyundai Capital America ("HCA"); and U.S. Bank National Association ("U.S. Bank") for an order approving a stipulation of settlement (the "Stipulation") with Livingstone Partners, LLC ("Livingstone"), with respect to the Court's June 9, 2010 order directing Livingstone to disgorge fees of $1.7 million (the "Disgorgement Order") awarded and paid to Livingstone.[2] Appearances were noted on the record. Although no objection was filed with respect to the motion, the Court *sua sponte* decided that a better record was necessary with respect to the Stipulation and the

---

[1] Jointly administered estates of the following Debtors: ARC Venture Holding, Inc., Case No. 08-46367; Southwest-Tex Leasing Co., Inc., d/b/a Advantage, Case No. 08-46368; Advantage Rent-A-Car, Inc., Case No. 08-46369; Coast Leasing Corp., Case No. 08-46370; Floral Leasing Corp., Case No. 08-46371; Iliad Leasing Corp., Case No. 08-46372; Miso Leasing Corp., Case No. 08-46373; Nugget Leasing Corp., Case No. 08-46374; Okra Leasing Corp., Case No. 08-46375; Rainier Leasing Corp., Case No. 08-46376; San Antonio Rental & Leasing Co., Inc., Case No. 08-46377; Steamboat Springs Rental and Leasing Co., Inc., Case No. 08-46379; Sun Leasing Corporation, Case No. 08-46380; Tradewinds U-Drive, Inc., Case No. 08-46383; Ute Leasing Corporation, Case No. 08-46384; Advantage Licensing LLC, Case No. 09-40394.

[2] Background facts contained in the Disgorgement Order are incorporated here by reference.

Court decided to take evidence. This Court has jurisdiction over the parties and exclusive jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C.A. §§ 157 and 1334, and Local Rule 1070-1. This case is a "core" proceeding pursuant to 28 U.S.C.A. § 157(b)(2).

Based on the files, records, and proceedings herein, the Court makes the following:

FINDINGS OF FACT

The unpaid administrative claims in the cases exceed $20 million. The estates currently hold approximately $5.8 million and are not anticipated to have revenues in excess of $12 million. Debtors' estates are administratively insolvent. Even if the $1.7 million paid to Livingstone will be returned to the estates to be distributed *in pari passu* to administrative claimants in the cases, there will be nothing left for unsecured creditors.

Under the terms of the Stipulation, Livingstone is required to disgorge $625,000, of which $500,000 is payable in cash immediately and an additional $125,000 is payable no later than June 30, 2011, or if Livingstone fails to make the June 2011 payment, then $250,000 is payable by December 31, 2011.[3]

The Trustee introduced evidence of the LLC's inability to pay only.[4] The Trustee made no attempt to establish that he had explored other sources of payment or contribution to the

---

[3] The Stipulation further provides that Livingstone is to execute a confession of judgment for the entire $1.7 million, less amounts actually paid, to be utilized for collection purposes by the movants in the event Livingstone fails to make the payments required under the Stipulation.

[4] The Court heard testimony from Stephen J. Miles, the managing partner of Livingstone. The Court received from Livingstone Exhibit A (Livingstone ownership chart), Exhibit B (the license agreement), Exhibit C (Livingstone's 2009 federal tax return), Exhibit D (distribution of the $1.7 million fee), Exhibits E and F (promissory notes payable to Livingstone Guarantee Services UK PLC), and Exhibit G (Livingstone's revenue and cash forecast).

settlement. The Trustee's only real argument was that the movants had, after laborious work, determined that Livingstone could not pay more than $625,000.

Livingstone is an LLC that was formed approximately four years ago and essentially operates as a partnership. According to Mr. Miles' testimony, and as indicated on Exhibit A, he and David C. Sulaski are each 50% owners of Livingstone. The company operates under a license from Livingstone Guarantee Services UK PLC. On the income side, Livingstone's revenues have steadily increased in each year of operation and will, according to the 50% partner's testimony, approach $5 million this year. At the year end in 2009 they were close to $4 million, which is a large percentage increase in revenues in a year when the rest of the economy is faltering. There is no evidence in this record that past history will not repeat itself. They are still doing about ten deals a year and they are still making $5 million this year.[5] Fear and speculation that business might get worse is not evidence. On this record, the only reasonable conclusion is that revenues will continue to remain stable or even increase.

On the expense side, as do most service industries of its sort, nearly 75% of Livingstone's expenses are in salaries and bonuses. In 2009, a year in which revenue was $3.7 million, Livingstone paid $2.5 million in salaries and bonuses (about one-half of that to the two 50% owners of the LLC). The partnership has few fixed costs, and none of substance other than its $120,000 annual rent and about $113,000 in taxes and expenses. The rest of its $3.4 million in expenses in 2009 was largely discretionary and could be easily adjusted should business turn bad.

---

[5] Mr. Miles testified that Livingstone's *minimum* fee for a deal is $500,000.

3

Livingstone's net profit in 2009 was roughly 10% of revenue, $368,573, a hefty margin for any business, especially given the state of the economy. The business is also well-capitalized with contributions by investors in the $1 million range. The capital accounts of these limited partners have been accumulating operating income and distributions have not been made to them since inception. Failure to distribute income, however, merely increases the capital accounts; it is accumulated by unpaid-out profits sitting on the books of the LLC.

In 2009 the LLC did well enough to pay off $500,000 in debt owed on two promissory notes. See Exhibits E & F.

Livingstone is cash rich. In 2008 it had $1.1 million in cash at year end; in 2009 it had $1.8 million in cash at year end; and as of June 30, 2010, it had $1.2 million in cash. It has a desire to keep $1 million in cash in reserve and it has done that for some time. However, a desire to hoard cash (especially when the cash is needed to pay out discretionary bonuses) does not establish that the company cannot pay out a large chunk of cash to its creditor, the bankruptcy estate.

Livingstone has a net worth of approximately $2 million as of 2009 (if one ignores its obligations to pay discretionary bonuses, which one would do in a liquidation). It has absolutely no long-term debt or much short-term debt.

The Trustee did not establish that he had sufficiently attempted to tap other sources of contributions to the settlement. Mr. Miles and Mr. Sulaski, the two partners, have great incentive to keep this business going and also to keep their reputations in their reputation-driven industry. It would not look good in the future for either of them to have to tell a bankruptcy court that they went into bankruptcy themselves. They are investments bankers. They have a

reputation and great incentive to pay this obligation, and they could help the LLC do so simply by lowering their salaries and bonuses which run in the $600,000 a piece range.[6] The only inference I could draw from what I heard is that they are sufficiently of substance that they could assist in paying the LLC's obligations; as the president of Ford did, they could take a reduction in pay for a while to get rid of this debt. I give no credence to the argument that it is unfair to make them pay for the debt that one of the other partners really got them into and then left. They took personal distributions from this deal and at the very least should give back the $85,000 a piece that Mr. Miles and Mr. Sulaski took from the deal. See Exhibit D. That is the minimum that they should contribute.

One other point of significance bears mention: One Worldwide LLC, which Mr. Miles testified that he and Mr. Sulaski also owned 50/50 was one of the investors and has been accumulating business profits (with no distributions) for four years. As of 2009, its capital account, which is nothing more than retained earnings that the partnership has made but not distributed to partners, was $575,000. That alone is the incentive to keep the LLC and the two partners out of bankruptcy.

CONCLUSIONS OF LAW

A. THE SETTLEMENT APPROVAL STANDARD

Approval or disapproval of a proposed settlement of a dispute to which a bankruptcy estate is a party is committed to the discretion of this Court. In re Flight Transportation Corp.

---

[6] Mr. Miles testified at the hearing that his income for 2009 was approximately $600,000. Following the hearing, counsel for Livingstone informed the Court that Mr. Miles had been mistaken and his "income from the firm" had been $450,000 instead. Whether Mr. Miles' income from the firm was $600,000 or $450,000 does not change the Court's analysis. Even $450,000 is a lot of money.

5

Securities Litigation, 730 F.2d 1128, 1135 (8th Cir. 1984), *cert. denied*, 469 U.S. 1207 (1985). In exercising this discretion, however, the Court must consider several relevant factors, which were first recognized by the Eighth Circuit in Drexel v. Loomis, 35 F.2d 800 (8th Cir. 1929).

> In assessing the reasonableness of a settlement, the factors to be considered can be summarized as follows:
> "(A) the probability of success in the litigation;
> (B) the difficulties, if any, to be encountered in the matter of collection;
> (C) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
> (D) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."

In re Martin, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997) *quoting*, Drexel, 35 F.2d at 806. In assessing the settlement, the Court is not to rely solely upon the Trustee's representations that the settlement is in the best interests of the estates. Rather, it must make an "informed, independent judgment" on the settlement after the parties have adequately developed the underlying facts and after the Court has thoroughly reviewed relevant parts of the record. Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).

As I stated at the hearing, I do not like this settlement, and notwithstanding the lack of objection to the motion seeking its approval, the parties were notified in advance of the hearing that I was skeptical of the settlement and that I wanted to make a record. The Trustee thus had plenty of warning that he had to make a good showing with an evidentiary record.

1. PROBABILITY OF SUCCESS IN THE LITIGATION

6

The Disgorgement Order obligates Livingstone to repay this bankruptcy estate the $1.7 million it received as payment for professional services during the Debtors' Chapter 11 cases. Livingstone has threatened to appeal the Disgorgement Order. However, the movants believe that the Disgorgement Order "was well drafted and is well grounded in the applicable law and facts, particularly in the express terms of the Order which authorized the retention of Livingstone . . . ." See *Movants' Memorandum of Law in Support of Motion*, at p.2. "The Movants are confident that they will prevail in any appeal." Id. The Court has no reason to think otherwise.

    2.    POTENTIAL DIFFICULTY IN COLLECTION

According to the Trustee, this is the primary issue which drives the settlement. The movants have reviewed tax returns and financial information of Livingstone, as well as Livingstone's records showing the application of the $1.7 million in question, presumably the same evidence reviewed by the Court. Movants have concluded, however reluctantly, that Livingstone does not have financial resources with which to pay the entire $1.7 million.[7] I conclude otherwise.

Livingstone's revenues have steadily increased in each year of operation and will, according to the 50% partner's testimony, approach $5 million this year. At the end of 2009, its revenues were close to $4 million, which is a large percentage increase in revenues in a year when the rest of the economy is faltering. There is no evidence in this record that past history will not repeat itself. They are still doing about ten deals a year–at no less than $500,000 a

---

[7] The Trustee introduced evidence of Livingstone's inability to pay only. The Trustee made no attempt to establish that he had explored other sources of payment or contribution to the settlement, e.g., partners or owners.

deal–and they are still making $5 million this year. On this record, the only reasonable conclusion is that revenues will continue to be stable or increase.

Nearly 75% of Livingstone's expenses are in salaries and bonuses. In 2009, a year in which revenue was $3.7 million, Livingstone paid $2.5 million in salaries and bonuses (about one-half of that to the two 50% owners of the LLC.). Aside from Livingstone's few fixed costs relating to annual rent, taxes, and expenses, the rest of its $3.4 million in expenses is largely discretionary and could be easily adjusted should business turn bad.

Livingstone is cash rich. In 2008 it had $1.1 million in cash at year end; in 2009 it had $1.8 million in cash at year end; and as of June 30, 2010, it had $1.2 million in cash. While Livingstone may have a desire to keep $1 million in cash in reserve, that apparent desire to hoard cash for prudent business operating, especially when the cash is hoarded to pay out discretionary bonuses, does not establish that it cannot pay out a large chunk of cash.

Livingstone's net profit in 2009 was roughly 10% of revenue, $368,573, a hefty margin for any business, especially given the state of the economy. The business is also well capitalized with contributions by investors in the $1 million range.

The Trustee did not establish that he had sufficiently attempted to tap other sources of contributions to the settlement. Mr. Miles and Mr. Sulaski, the two partners, have great incentive to keep this business going and also to keep their reputations in their reputation-driven industry. It would not look good in the future for either of them to have to tell a bankruptcy court that they went into bankruptcy themselves. They are sophisticated[8] and well-paid

---

[8] Under the retention arrangement, Livingstone was not represented by counsel. I have no sympathy with respect to Mr. Miles' argument that had he known that the $1.7 million paid to Livingstone might need to be disgorged in the future, he would never have taken the deal. Mr.

investments bankers. They have a reputation and great incentive to pay this obligation and they could help the LLC do so simply by lowering their salaries and bonuses which currently run in the half-a-million-dollar range. Mr. Miles and Mr. Sulaski took personal distributions from this deal and at the very least should give back the $85,000 a piece that they took from the deal (and that is the minimum that they should contribute).

Livingstone's and its partners' and owners' desire to avoid bankruptcy is also not a basis for approving the Stipulation. Indeed, Livingstone and its owners are doing extremely well. Moreover, the simple injustice of permitting Livingstone to walk away from this deal is particularly evident when one considers that under the Stipulation, Livingstone is permitted to retain $1,075,000 (63% of $1.7 million), while other administrative claimants are expected to be paid, according to the Trustee's current estimate, between 25 to 50% on their administrative claims, and perhaps more importantly, unsecured creditors will receive absolutely nothing in these cases.

3.  COMPLEXITY OF THE LITIGATION, EXPENSE, INCONVENIENCE, AND DELAY

According to the movants, an appeal of the Disgorgement Order would delay the resolution of this matter by several months and would consume a certain amount of resources of the bankruptcy estates. Movants believe that it would prevail on appeal, but costs of appealing could amount to $25,000 to $40,000. It is noteworthy that while the $500,000 payment is immediately due, the final payment under the Stipulation is not due until June 30, 2011 (the better part of a year from now), or perhaps as late as December 31, 2011 (well over a year from

---

Miles and his colleagues are sophisticated investment bankers and have been involved in many deals before. In short, he should have known better. Ignorance of the law is not a viable excuse.

9

now). This factor therefore is, in my estimation, neutral, but likely weighs against approval of the Stipulation, especially when the greater potential return to the estates under the terms of the Disgorgement Order is considered.

   4.  THE PARAMOUNT INTEREST OF CREDITORS

The general unsecured creditors will not share in the disgorged payment from Livingstone. The class of creditors which will benefit from the Livingstone payments is restricted to certain Chapter 11 administrative claimants, *i.e.*, the so-called Fleet Lenders. The record before me demonstrates that the movants have a different agenda, which I can only conclude is battle fatigue. Battle fatigue is not a reason not to get the most for creditors, even if they are administrative-expense creditors. Nor is battle fatigue an excuse to accept a settlement that does not get the most for creditors–even administrative creditors–where the issue of professional retention is involved. Livingstone's narcissistic support of the Stipulation is self-evident.

B.  THE TRUSTEE'S ARGUMENT THAT THE SETTLEMENT IS "GREATER THAN $625,000"

One final argument of the Trustee bears mention and an analysis of it touches on all of the <u>Drexel</u> factors. The Trustee's argument was that if, as part of the proposed settlement, Livingstone had not agreed to waive its right to make an administrative-expense claim at the end of the case, it would be entitled to get some money back at the end of the case, *i.e.*, as a result of any disgorgement. He then argued that the settlement amount was effectively in an amount greater than $625,000, which was based on his estimation of what Livingstone would have been entitled via a percentage distribution as an administrative claimant at the end of the case for any disgorged amount.

10

The Trustee represented that in addition to paying the $625,000 in cash, as part of the settlement, Livingstone agreed to give up its claims against the estates, *e.g.*, an administrative-expense claim for the $1.7 million disgorged fee and, agreeing to do so, gave up its right to share in a percentage distribution to administrative claimants at the end of the case. The Trustee's current (but not yet complete) estimate is that there will be between a 25 to 50% payout at the end of the case to administrative claimants. Thus, he estimated that Livingstone would have been entitled to a payment between "$350,000 to $800,000" (his math was somewhat off using his own percentages) at the end of the case, which he then "added" to the $625,000. In other words, the Trustee assigned that "given up" administrative claim a value, and "added" it to the $625,000 Livingstone agreed to disgorge in cash.

While it is true that under the current settlement proposal, the estates are scheduled to receive $625,000 in cash ($500,000 now and an additional $125,000 by June 30, 2011–or if Livingstone fails to make the $125,000 payment in June 2011, $250,000 by December 31, 2011) and in return Livingstone agrees to waive any administrative-expense claim it might have for such disgorged amounts, it is also an undisputed fact that Livingstone actually received $1.7 million from the debtor, the entire amount of which this Court ordered Livingstone to disgorge. Under the current settlement arrangement, however, essentially ignored is the stark fact that Livingstone is poised to retain and, more importantly, the estates are simply "out" no less than $1,075,000 of the $1.7 million ordered disgorged.

Additionally, while the Trustee's premise that Livingstone would otherwise be entitled to make an administrative-expense claim might be sound enough, the Trustee assigns–under his settlement analysis–an erroneous value to Livingstone's theoretical share at the end of the case,

11

which in turn results in his inflated settlement figure of something in the neighborhood of $1 million, at least according to the Trustee. The Trustee, however, is working a figure into the settlement that does not exist, *i.e.*, he's working a percentage of the entire $1.7 million and then adding that figure to the $625,000, but under the current settlement stipulation, Livingstone is not disgorging $1.7 million. In other words, had Livingstone not agreed to waive its ability to seek an administrative-expense payment for any disgorged amount, it might have been entitled to payment of only 25 to 50% of $625,000 (somewhere between $156,250 and $312,500); not 25 to 50% of the entire $1.7 million. Thus, Livingstone would not be entitled to 25 to 50% of $1.7 million, as the Trustee argued should be "added" to the $625,000 cash payment.

Speaking in less theoretical terms, however, if there was no settlement and Livingstone was required to disgorge the entire $1.7 million, as the Disgorgement Order provides, under the Trustee's own analysis, Livingstone should be entitled to make a $1.7 million administrative-expense claim against the estates. Using the Trustee's percentages, Livingstone would receive back between $425,000 and $850,000 ($1.7 million disgorged times 25 to 50%). It bears noting that these latter figures would likely be subject to a modest adjustment given the whole $1.7 million being added to the proverbial administrative pot, less any appellate expenses of the estates, which the Trustee represented in the motion could be $25,000 to $40,000. In addition, while it must be recognized, of course, that there might be some costs of collection if the June 9, 2010 Disgorgement Order was appealed and subsequently affirmed on appeal, it must also be recognized that there would be a lot more money added to the administrative pot at the onset, *i.e.*, approximately $1.7 million versus $625,000.

Finally, in the memorandum in support of the motion for approval of the settlement stipulation, the movants submit that they are "confident" that they would prevail on appeal. Without a settlement and if there was an appeal, *i.e.*, if the June 9, 2010 Disgorgement Order was enforced by the Trustee and affirmed on appeal, Livingstone would still be paid back between $425,000 and $850,000 ($1.7 million disgorged times 25 to 50%). Thus, under the Trustee's analysis, even without a settlement, Livingstone would be ultimately returned up to 50% of the $1.7 million ordered disgorged.

In this light, the Trustee's argument that the current settlement results in an amount effectively greater than $625,000 misses the point, especially when one looks at the bottom line and the ultimate benefit to the estates. On the one hand, under the proposed settlement, only $625,000 comes into the estates and the estates have no further obligation to Livingstone, but Livingstone retains–no questions asked–$1,075,000 of the $1.7 million ordered disgorged. On the other hand, if the settlement is not approved, the estates are entitled to $1.7 million, minus a potential payback to Livingstone of somewhere between $425,000 and $850,000, leaving the estates with somewhere between $850,000 and $1,275,000 in additional funds, which is $225,000 to $425,000 more than the estates would receive under the current settlement proposal.

Moreover, it is clear why Livingstone favors the proposed settlement: it comes out smelling like a rose, *i.e.*, it retains $1,075,000, which is substantially more than it would have otherwise been entitled as an administrative claimant had there been no proposed settlement. In other words, under the current settlement proposal, Livingstone would retain over 63% of the $1.7 million payment it received from the debtor.

As a result, it is less than clear to me why, as the Trustee suggested, the proposed settlement is the "least unpalatable alternative."

In conclusion, the parties were warned in advance of the hearing that the Court was skeptical of this settlement. The Trustee had plenty of warning that he had to make a good case with an evidentiary record, but the Trustee failed to establish the <u>Drexel</u> factors.

ACCORDINGLY, IT IS HEREBY ORDERED THAT the motion is DENIED.

/e/ Nancy C. Dreher
Nancy C. Dreher
Chief United States Bankruptcy Judge

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *09/07/2010*
Lori Vosejpka, Clerk, by KK

14